## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Shameir Satterwhite, | Case No. 21-CV-00669 (SRN/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Alejandro Mayorkas, *Secretary of Homeland Security, Washington D.C.*, Tracy Renaud, *or successor, Senior Official Performing the Duties of the Director of the U.S. Citizenship and Immigration Services, Washington, D.C.*, Leslie Tritten, *Minneapolis Field Office Director of U.S. Citizenship and Immigration Services, Minneapolis, MN*, | |
| Defendants. | |

Marc Prokosch and Kelsey Hines, Prokosch Law, LLC, 1700 West Highway 36, Suite 570, Roseville, MN 55113, for Plaintiff.

Bahram Samie, Department of Justice - United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the parties' cross motions for summary judgment. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Motion for Summary Judgment [Doc. No. 20] filed by Defendants Alejandro Mayorkas, Tracy Renaud, and Leslie Tritten ("Defendants") is **GRANTED**, and the Motion for Summary Judgment [Doc. No. 16] filed by Plaintiff Shameir Satterwhite is **DENIED**.

## I.    BACKGROUND

This dispute arises from the denial of Satterwhite's I-130 Petition for Alien Relative (the "Petition"), which was filed on behalf of her husband, Evans Kipkosgei Tanui, by the United States Citizen and Immigration Services ("USCIS").[1]

### A.    Tanui Enters the United States

Tanui, a citizen of Kenya, was admitted into the United States on August 15, 2011, on an F-1 nonimmigrant student visa. (A.R. at 156, 172, 179.) Tanui never finished his studies and thus his status was terminated in the Student Exchange Visitor Information System on February 6, 2013. (*Id.* at 174, 179.) In addition, his F-1 visa expired on July 27, 2013. (*Id.* at 105.) Tanui nevertheless remained in the United States and began working at a grocery store. (*Id.* at 174.)

Tanui met Satterwhite in the summer of 2015. (*Id.* at 59.) He proposed in January of 2016. (*Id.* at 54, 59.) Because Satterwhite had never legally divorced her first husband, their marriage on March 8, 2016, was invalid. (*See id.* at 55, 60, 107-11.) About seventeen months later, on August 1, 2017, Satterwhite officially divorced her first husband. (*Id.* at 107-11.)

### B.    Arrest Warrant and Notice to Appear

On September 26, 2017, USCIS detained Tanui and served him with a Notice to Appear ("NTA"). (*See generally id.* at 172-83.) Officers arrested Tanui at the grocery

---

[1]    The Court relies on the Administrative Record, which is at Docket Numbers 15, 15-1, and 15-2. Although it was filed under three Docket Numbers due to filing restrictions, it has been numbered as one continuous record from page 1 through page 306. The Court refers to the Administrative Record as "A.R. at Page Number."

store where he worked. (*Id.* at 174.) USCIS detained him at Sherburne County Jail where he was questioned about his visa status and family, among other things. (*Id.* at 173-76.) During this questioning, he confirmed that he had quit school and never applied for a visa extension. (*Id.* at 174.) He also stated that he had no family in the United States. (*Id.*) The NTA required Tanui to appear before an immigration judge at Fort Snelling, MN, with the date and time "[t]o be set." (*Id.* at 177-79.) USCIS released Tanui in October of 2017. (*Id.* at 60.)

Shortly thereafter, on November 30, 2017, Satterwhite and Tanui were legally married. (*Id.* at 60-61, 106.) Then, on January 12, 2018, Satterwhite filed the Petition on Tanui's behalf. (*Id.* at 83-94.)

### C.    USCIS's Investigation

USCIS investigated the Petition. (*See, e.g.*, *id.* at 304.) On March 4, 2019, it conducted individual interviews with Satterwhite and Tanui. (*Id.* at 120-23, 304.) Because of some inconsistencies in their answers, USCIS conducted a further investigation. (*Id.* at 52.) It issued a Request for Evidence, requiring Satterwhite to provide evidence that she and Tanui "have a valid marriage" and that "it was not entered into for immigration purposes." (*Id.* at 4-5, 52.) USCIS also subpoenaed the school records of Satterwhite's daughter, (*id.* at 202, 214-24), and reviewed Satterwhite's police records, (*id.* at 225-63). Lastly, USCIS conducted a site visit at Satterwhite and Tanui's claimed joint address. (*See id.* at 57, 205-06, 212-23.)

### D.     USCIS's Decision

#### 1.     Notice of Intent to Deny the Petition

On August 3, 2020, USCIS issued a Notice of Intent to Deny ("NOID"), outlining the proposed reasons for denying the Petition.  (*Id.* at 51-53.)  First, USCIS highlighted certain discrepancies in Satterwhite's and Tanui's interview answers.  (*Id.* at 51-52.)  For example, Satterwhite stated that she enjoyed Cassava leaves and African greens, while Tanui testified that she did not like African food.  (*Id.* at 52.)  Similarly, Satterwhite stated that Tanui's proposal was a surprise and that he bent down on one knee and presented her with a ring, but Tanui stated that it was not a surprise and that he proposed while sitting on Satterwhite's couch because his culture is not big on proposals.  (*Id.*)  Likewise, Satterwhite testified that after their first wedding they ordered Applebee's takeout, and after the second wedding they went to Super Moon Buffet, while Tanui generally stated that they went home and made food.  (*Id.*)  Lastly, Satterwhite stated that, for her daughter's birthday, the family celebrated at Red Lobster, but Tanui stated that they had a party at home.  (*Id.*)

Second, USCIS noted Satterwhite's infidelity.  (*Id.*)  Satterwhite's police records showed that, during the fall of 2018, she had an extramarital relationship with a man named Tyronn Malcom Toregano.  (*Id.*)  This relationship was confirmed by Satterwhite in a digital recording where she explained that she met Toregano in August of 2018 on the application "Plenty of Fish."  (*Id.*)  Police records also showed that she referred to another man, named Bradford Lawrence Scott, as her boyfriend in February of 2019.  (*Id.*)

Lastly, USCIS highlighted concerns arising from its site visit to Satterwhite and Tanui's claimed joint address.  (*Id.*)  USCIS noted Satterwhite's "confusion about the

purpose of the site visit." (*Id.*)  It further noted that Satterwhite told officers that she "never filed a petition," her signature "must have been fordged [sic]," she had "not seen the beneficiary since the interview at USCIS," and "the beneficiary was not living with [her] at the time of the interview." (*Id.*)

Taken together, USCIS concluded that Satterwhite failed to meet her burden in establishing a legitimate marriage and thus expressed its intent to deny the Petition. (*Id.*) It informed Satterwhite that she had 30 days to offer written evidence to rebut this conclusion. (*Id.*)

### 2.     Satterwhite's Rebuttal

On September 2, 2020, USCIS received Satterwhite's response. (*See generally id.* at 38-74.)  In her response, she challenged the findings of the investigation and submitted additional documentation.[2] (*Id.* at 38-57.)

First, Satterwhite addressed her and Tanui's seemingly inconsistent interview answers. (*Id.* at 40-43, 54-57.)  Regarding African food, she explained that both of their answers are accurate because it is true that she likes Cassava leaves, but it is also true that there are some African foods that she does not like and that she does not enjoy cooking African food. (*Id.* at 41, 54.)  In relation to her daughter's birthday, she explained that each person was referring to a different birthday party—Tanui referred to her 2017 party, which

---

[2]     Satterwhite submitted affidavits from herself, her daughter, her sister, Tanui, and Tanui's sister, along with a letter from Park Nicollet Hospital, notes of counsel from the I-130 Interview, and additional photographs. (A.R. at 50, 54-74.)

was at home, while she referred to the 2018 party, which was at Red Lobster.  (*Id.* at 42-43, 55, 57.)

Regarding their answers about the marriage proposal and wedding reception, she explained that there were two proposals and two weddings.  (*Id.* at 41-42.)  She stated that the first proposal occurred when Tanui asked Satterwhite to marry him when they were sitting on the couch together in January 2016.  (*Id.* at 41, 54.)  Although she said yes, Satterwhite told Tanui that she would have preferred a special proposal in line with the customs of America.  (*Id.* at 41, 54-55.)  Since their first marriage was invalid, Tanui got down on one knee and gave Satterwhite an engagement ring when he proposed for their second marriage in October 2017. (*Id.* at 42, 55, 60.)  In the same way, she explained that after the first wedding they celebrated at Super Moon Buffet, and after the second wedding, they ordered takeout from Applebee's.[3]  (*Id.* at 42, 55-56.)

Second, she challenged USCIS's finding that her relationship with Toregano undermined the validity of her marriage to Tanui.  (*Id.* at 44-46.)  She claimed that, although she had been unfaithful in her marriage, her relationship with Toregano was brief. (*Id.* at 45, 56.)  She also asserted that she and Tanui reconciled after she ended the relationship with Toregano. (*Id.* at 55-56.)  In addition, she disputed that Scott was her boyfriend, asserting that, despite being present when the police arrived, she never told them

---

[3]     The notes from the interview reflect that Satterwhite originally testified to the reverse order, specifically, they picked up food from Applebee's after the first wedding and ate at Super Moon Buffet after the second wedding.  (A.R. at 122.)

that he was her boyfriend.  (*Id.* at 45, 56-57.)   Tanui also declared that Scott was not Satterwhite's romantic partner.  (*Id.* at 61.)

Third, Satterwhite challenged USCIS's concern that Tanui does not reside at her apartment.  (*See id.* at 56.)   She explained that she suffers from bipolar disorder, which can exacerbate their marital issues.  (*See id.* at 48-49, 56-57.)  She believed that her status as the sole breadwinner, combined with her mental health issues, caused her to get angry at Tanui.  (*Id.* at 56.)  During these times, she kicked him out of the house.  (*Id.* at 56-57.) But she stated that he lives with her now.  (*Id.* at 57.)

Lastly, Satterwhite claimed that she lied to USCIS officers during the site visit.  (*Id.* at 47-49, 57.)  She stated that she was scared when she saw the officers' handcuffs because it reminded her of Tanui's arrest and she did not want him to be arrested again.  (*Id.* at 57.) She claims this was the reason why she lied about her lack of knowledge of the Petition, claimed her signature had been forged, and asserted that Tanui did not live with her.  (*Id.*)

### 3.   Final Decision

On February 9, 2021, USCIS denied the Petition, finding that Satterwhite and Tanui had "entered into the marriage solely in order to gain immigration benefits."  (*Id.* at 31, 35.)  In addition to the reasons identified in the NOID[4], USCIS highlighted several other instances where Satterwhite was untruthful, explaining that her lack of honesty undermined her credibility.  (*Id.* at 35.)  USCIS also noted that there was a general lack of evidence that

---

[4]   USCIS's denial makes many of the same findings and provides some of the same analysis that was in the NOID.  (*Compare* A.R. at 51-52, *with* A.R. at 31-36.)

they were living together.  (*Id.*)  Lastly, it informed Satterwhite that she had thirty days to appeal the decision to the Board of Immigration Appeals. (*Id.* at 36.)  Nothing in the record suggests that Satterwhite appealed the decision.

### E.    Procedural History

On March 9, 2021, Satterwhite initiated this action for judicial review by filing the Complaint [Doc. No. 1].  The parties each move for summary judgment.  The Court addresses the motions below.

## II.    DISCUSSION

### A.    Legal Standard for Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intel., Inc.*, 812 F.3d 701, 707 (8th Cir. 2016).  And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a

genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### B.   Review of Agency Action

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  The court may "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  The court's review is limited to the record before the agency.  *See Sierra Club v. Davies*, 955 F.2d 1188, 1192 (8th Cir. 1992).  The court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Under this standard of review, the court "must defer to any reasonable interpretation given to [a] statute by the agency charged with its administration."  *Ark. Poultry Fed'n v. U.S. Env't Prot. Agency*, 852 F.2d 324, 325 (8th Cir. 1988).  "An agency acts arbitrarily or capriciously when it fails to consider the relevant matters and there is a clear error of judgment."  *Cermak v. Norton*, 322 F. Supp. 2d 1009, 1014 (D. Minn. 2004) (internal

quotation marks and citation omitted).   The duty of the district court "is to determine whether there is a rational connection between the facts and the agency's actions."   *Id.*

## C.    Analysis

Satterwhite argues that USCIS's denial of her I-130 Petition was arbitrary and capricious for three reasons.  (Pl.'s Mem. [Doc. No. 18] at 10-17; Pl.'s Opp'n [Doc. No. 24] at 20-21.)  First, Satterwhite contends that USCIS applied the wrong legal standard. (*Id.* at 10-14.)   Second, she argues that it failed to appropriately consider her bipolar disorder.  (*Id.* at 15-17.)  Lastly, she asserts that USCIS failed to consider the totality of the evidence.  (Pl.'s Opp'n at 20-21.)  The Court considers each argument in turn.[5]

### 1.    Clear and Convincing Standard

Under the Immigration and Nationality Act, a citizen or lawful permanent resident may petition on an alien spouse's behalf to classify the alien spouse as the petitioner's relative for visa purposes.  8 U.S.C. §§ 1153(a), 1154(a).  The petitioner files a Form I– 130, Petition for Alien Relative.  8 C.F.R. § 204.1(a)(1); 8 U.S.C. § 1154(a)(1)(A)(i).  The petitioner bears the burden to establish eligibility of the alien spouse.  8 U.S.C. § 1361.

---

[5]     Satterwhite also argues that USCIS failed to produce "substantial and probative evidence" of marriage fraud.  (Pl.'s Mem. at 17-19.)  Generally, to reject an I-130 petition for marriage fraud, "USCIS must find that there is 'substantial and probative evidence' that the marriage was a sham."  *Saleh v. Holder*, 54 F. Supp. 3d 1163, 1169 (D. Nev. 2014) (citing 8 C.F.R. § 204.2(a)(1)(ii)).  However, "there are certain situations," like in this case, "where there is a presumption of marriage fraud and the petitioner seeking an immediate relative classification for their spouse bears the burden at the outset of proving that the marriage was bona fide," including when petitioner marries during the pendency of removal or deportation proceedings.  *Id.* at 1169 n.1; *see also* 8 U.S.C. § 1255(e). Accordingly, the "substantial and probative evidence standard" does not apply here.

After an I-130 is filed, USCIS investigates the petition and adjudicates it. 8 U.S.C. § 1154(b). The test for a *bona fide* marriage is whether, at the beginning of the marriage, "the two parties have undertaken to establish a life together and assume certain duties and obligations." *Lutwak v. United States*, 344 U.S. 604, 611 (1953).

However, if the alien marries after removal or deportation proceedings have commenced, then petitioner must establish "by clear and convincing evidence" that "the marriage was entered into in good faith and in accordance with the laws of the place where the marriage took place and the marriage was not entered into for the purpose of procuring the alien's admission as an immigrant and no fee or other consideration was given." 8 U.S.C. § 1255(e). Jurisdiction vests in the immigration court, and removal proceedings commence, "when a charging document, including a notice to appear, is filed with the Immigration Court." *Ali v. Barr*, 924 F.3d 983, 986 (8th Cir. 2019); 8 U.S.C. § 1229; 8 C.F.R. §§ 1003.13, 1003.14(a).

However, Satterwhite argues that the NTA served on Tanui was "legally insufficient to initiate removal proceedings against him" because it failed to specify the date and time. (Pl.'s Mem. at 12.) If removal proceedings never commenced, Satterwhite contends that the "clear and convincing standard" was the wrong legal standard to apply, asserting instead that the "preponderance of the evidence standard" should have applied. (*Id.* at 10-13.) To support her position, Satterwhite cites *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), and *Niz-Chavez v. Garland*, 141 S. Ct. 1474 (2021). (Pl.'s Opp'n at 14-19.)

USCIS responds that the NTA was valid under Eighth Circuit precedent. (Def.'s Mem. & Opp'n [Doc. No. 22.] at 13-16.) It argues that it was statutorily required to apply

the "clear and convincing standard" because Satterwhite and Tanui did not legally marry until November 30, 2017, which was after USCIS served the NTA on September 26, 2017. (*Id.* at 12-13.)

The Court finds that the NTA issued in this case was legally sufficient to commence removal proceedings and therefore finds that USCIS applied the correct legal standard.

In *Ali*, the Eighth Circuit explicitly rejected plaintiff's argument. 924 F.3d at 986. There, plaintiff argued that the NTA was invalid because it did not "contain the time and place of [plaintiff's] removal proceeding." *Id.* In rejecting this argument, the court explained that "a notice to appear need only provide the time, place, and date of the initial removal proceedings '*where practicable*.'" *Id.* (emphasis added). The Eighth Circuit distinguished plaintiff's case from *Pereira*, explaining that *Pereira* addressed a narrow issue that did not impact "when an immigration judge obtains jurisdiction over an alien's removal proceedings." *Id.* Accordingly, the Eighth Circuit held that, although the NTA did not specify the time or place of removal proceedings, the immigration court nonetheless obtained jurisdiction over the proceedings. *Id.*

The Eighth Circuit recently affirmed *Ali*. *See Tino v. Garland*, 13 F.4th 708, 709 (8th Cir. 2021). In *Tino*, the petitioner argued that the immigration court "never acquired jurisdiction over her proceedings because her Notice to Appear (NTA) was deficient." *Id.* The court explained that "this court's precedent forecloses" that argument, citing *Ali*. *Id.* Relevant here, the Eighth Circuit also addressed *Niz-Chavez*. *Id.* at 709 n.2. The court explained that *Niz-Chavez* related to the time-stop rule and that it did not disturb the Eighth Circuit's "jurisdiction-related precedent." *Id.*

12

This Court is bound by the Eighth Circuit's precedent.  Because there is no question that an NTA does not need to specify the date and time to commence removal proceedings under *Ali* and *Tino*, the Court rejects Satterwhite's argument.  The record establishes that removal proceedings began on September 26, 2019, approximately two months before Tanui and Satterwhite legally married.  Accordingly, USCIS applied the correct legal standard to its analysis.  *See* 8 U.S.C. § 1255(e).

## 2.    Satterwhite's Bipolar Disorder

Next, Satterwhite argues that USCIS acted in an arbitrary and capricious manner by not giving "nearly enough deference to the presence of Satterwhite's mental health struggles in evaluating the evidence of the record." (Pl.'s Mem. at 15.)  To support its argument, Satterwhite cites *Agyeman v. I.N.S.*, 296 F.3d 871 (9th Cir. 2002), and *Nguyen v. Mayorkas*, Civ. No. 20-cv-00976-VKD, 2021 WL 1091916 (N.D. Cal. Mar. 22, 2021). (Pl.'s Mem. at 15; Pl.'s Opp'n at 4, 10.)  But these cases do support Satterwhite here.

In *Agyeman*, the Ninth Circuit held that the petitioner, during his deportation proceedings, was not afforded a full and fair hearing.  296 F.3d at 875-77.  The court explained that, because the petitioner was pro se, the immigration judge had a duty to develop the record and adequately explain the proceedings to the petitioner.  *Id.* at 877.  At the hearing, the immigration judge ruled that the wife's testimony "was the only means" by which the petitioner could prove that he had a bona fide marriage.  *Id.*  The Ninth Circuit held that was not an accurate statement of the law and thus, because the judge improperly required her testimony, the petitioner had not received a full and fair hearing.  *Id.* at 877, 880, 884.  The court further explained that, even if the wife was required to testify under

13

the law, a good cause waiver should have been considered because she "suffer[ed] from bipolar disorder" that required her to be "hospitalized for periods of two or three months at a time." *Id.* at 880-82.

Satterwhite's case is very different. First, USCIS was adjudicating an I-130 petition—not analyzing whether a good cause waiver applied. Second, Satterwhite was not pro se. Third, unlike the spouse in *Agyeman*, Satterwhite testified during these proceedings.

Nor does *Nguyen* support Satterwhite here. In that case, a wife filed an I-130 petition on behalf of her husband. *Nguyen*, 2021 WL 1091916, *1. During its investigation, USCIS conducted a second round of interviews, given concerns raised in the first round of interviews. *Id.* at *1-2. During her second interview, the wife admitted that "she had agreed to marry [the beneficiary] to help him with a green card; that [he] had offered to pay $30,000 to marry him; and that she did not live with [him] and did not know where he lived." *Id.* She then signed a document voluntarily withdrawing the I-130 petition. *Id.* at *2. Two weeks later, the wife declared that she had made those statements while under duress. *Id.* She also claimed that she had mental health issues and submitted a "treatment summary" that was prepared by her therapist, whom she began receiving therapy from after her second interview. *Id.* USCIS ultimately discounted the therapist's treatment summary, explaining that it was "silent as to the quality of [her] testimony and [her] ability to provide testimony on [the day of her second interview]." *Id.* at *3.

On review, the federal district court found that USCIS provided a rational explanation, supported by the record, for discounting the treatment summary. *Id.* at *4.

The court explained that the treatment summary did not "draw any connection between those mental health issues and what transpired at the interview," nor did it state that the wife's mental condition "would have undermined the voluntariness of her statements or her ability to understand the officer's questions." *Id.*

In this case, there is a lack of evidence relating to Satterwhite's bipolar disorder; it consists simply of Satterwhite's and Tanui's affidavits and a letter from a physician assistant at Park Nicollet Hospital. As explained below, USCIS had a rational basis to find the affidavits of Satterwhite and Tanui not credible. And the letter simply provided that Park Nicollet had "worked with [Satterwhite] on the plan to treat her medical issues," one of which is bipolar disorder, and listed some prescribed medications. (A.R. at 67.) Similar to *Nguyen*, the letter did not draw a connection between Satterwhite's mental health issues and her testimony. Nor did it undermine the voluntariness of her contradictory statements about Tanui. In fact, the letter did not even allege that Satterwhite suffered from these mental health conditions during the relevant period.

Accordingly, the Court is unpersuaded that USCIS should have given more weight to Satterwhite's bipolar disorder, given the lack of credible evidence about her disorder, and its relevant impact, in the record.

### 3.      Totality of the Evidence

Lastly, Satterwhite asserts that USCIS acted arbitrarily and capriciously by failing to consider the totality of the evidence, asserting that her daughter's affidavit was not considered. (Pl.'s Opp'n at 20-21.) The Court disagrees.

USCIS did in fact consider the totality of the evidence when evaluating the inconsistent interview answers.   For example, it carefully found that some of her explanations were plausible and some were not.  (*Id.* at 34, 38-74, 120-23.)  It reasoned that it was not plausible that Tanui and Satterwhite were recounting different marriage proposals because neither mentioned that there were two proposals during the interviews, and both referred to a proposal that occurred early in their relationship.  (*Id.* at 34.)  This is a reasonable explanation for discounting Satterwhite's and Tanui's later-filed affidavits, based on the evidence in the record.

USCIS also considered all of the evidence in the record when concluding that Satterwhite and Tanui were not truthful about their separations during their marriage.  (*Id.* at 34-35.)  USCIS considered their interviews, where Satterwhite testified that Tanui had spent the night at a friend's house a few times and Tanui testified that he had stayed away for three-to-four days.  (*Id.*)  It compared that testimony with other evidence that suggested that Tanui had not lived with Satterwhite from August of 2018 through February of 2019, including eight documented police conversations, that occurred over the course of thirteen months, where Satterwhite never mentioned Tanui.  (*Id.* at 34-35.)  Instead, USCIS found compelling the statement to police made by Robin Boyd, who claimed to be staying at Satterwhite's apartment to take care of Satterwhite.  (*Id.* at 34.)  It also considered evidence, during this same period, that Satterwhite had romantic relationships with other men.  (*Id.* at 33.)  Further, USCIS considered Satterwhite's comments, during the site visit, that Tanui did not live with her and had not lived with her since before the interviews.  (*Id.*)  Taken together, USCIS had a reasonable basis to conclude, from the evidence, that Tanui had not

lived with Satterwhite for an extended period and thus that they were not being truthful about their living arrangement.

Further, USCIS relied on the totality of the evidence in concluding that Satterwhite's sentiments were not credible. For example, it considered Satterwhite's admission that she had lied to officers during the site visit. (*Id.* at 35.) It also considered Satterwhite's explanation for why she lied—she saw handcuffs and was afraid they would arrest Tanui— and found it not credible because USCIS officers do not carry handcuffs. (*Id.*) Furthermore, USCIS considered Satterwhite's statement that her signature on the Petition had been forged, although her affidavit attested that it had not been forged. (*Id.* at 33-34.) After comparing two verified signatures with the signature on the Petition, it had a rational basis to conclude that her signature had been forged. (*Id.* at 35.)

Next, USCIS considered the third-party affidavits, including the one "from [Satterwhite's] daughter." (*Id.*) It acknowledged that the affidavits characterized Satterwhite and Tanui's relationship "as a very good one." (*Id.*) But USCIS could not reconcile these affidavits in light of the other evidence in the record, namely, the police reports and Tanui's and Satterwhite's affidavits that described in detail many serious marital issues, including "kicking him out of the house," "fighting a lot," "get[ting] upset with him," struggling with mental health issues, and engaging in extramarital affairs. (*Id.* at 56-57, 60-61.) In fact, at one point, Tanui "said [he] was done with the relationship." (*Id.* at 61.) Given this evidence, and the fact that the third-party affidavits fail to mention any of these issues, USCIS had a reasonable basis to give the affidavits little weight because

"it is not evident [that] the writers possess much knowledge about the relationship." (*Id.* at 35.)

Lastly, USCIS considered the totality of the evidence in finding that there was a "general lack of documentary evidence attesting to the [*bona fide*] nature of the relationship." (*Id.*)  It found that there were "virtually no shared assets or liabilities, no proof of common residence, a number of unconvincing affidavits, and some photos depicting a very limited number of occasions." (*Id.*)  The Court has reviewed the evidence in the record and finds that USCIS had a rational basis to make these findings.  For example, there is evidence of only one joint checking account that was opened after removal proceedings began and that account carried a nominal balance.  (*See, e.g.*, *id.* at 114, 128-37.)  Moreover, Satterwhite provided twenty-nine photographs that appear to relate to only five dates over the course of two years.  (*See id.* at 22-28, 72-74, 115-19, 142-48.)  Notably, none of the photographs was taken after their marriage on November 30, 2017.

For all of these reasons, the Court grants Defendants' motion for summary judgment.

## III.   CONCLUSION

Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Motion for Summary Judgment [Doc. No. 20] filed by Defendants Alejandro Mayorkas, Tracy Renaud, and Leslie Tritten is **GRANTED**, and the Motion for Summary Judgment [Doc. No. 16] filed by Plaintiff Shameir Satterwhite is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September 6, 2022                    s/ Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge